**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

        v.

BARRY WHITAKER,

                Defendant.

**REPORT AND
RECOMMENDATION**
17-cr-6156-EAW-JWF

### Background

Before the Court are defendant Barry Whitaker's (hereinafter "the defendant" or "Whitaker") motions to suppress evidence and statements (Docket # 16). In a five-count indictment, the Grand Jury charged Whitaker with various gun and drug charges: intent to distribute heroin and cocaine, possession of a controlled substance, possession of a firearm in a drug trafficking crime, and being a felon in possession of a firearm. Docket # 10.

The defendant filed omnibus motions (Docket # 16) and most of these were decided or resolved at oral argument (Docket ## 18, 19). The Court reserved on Whitaker's motions to suppress evidence and statements. Evidentiary hearings on these motions to suppress were held on February 16, March 9 and April 3, 2018. Lieutenant Michael Suhey ("Suhey"), Officer Robert Raymond ("Raymond"), Officer Thomas Marsh ("Marsh"), Officer Christopher Zelko ("Zelko") and Karen Francati ("Francati") all testified during the hearings. Docket ## 20, 22, 23.

1

After the hearings were completed, the parties filed post-hearing briefs on June 29, 2018. Docket ## 30, 31. The defendant filed a response on July 13, 2018 (Docket # 32) and the government declined to respond (Docket # 33). In seeking suppression, Whitaker argues that that the stop of his rental car was not justified because it was based on an anonymous, uncorroborated tip, and a manufactured traffic violation. Whitaker further argues that two of his statements must be suppressed because they were given before he received Miranda warnings or before he waived his rights. For the reasons that follow, it is my report and recommendation that the defendant's suppression motions be **denied**.

## Relevant Facts[1]

Four different law enforcement officers testified on behalf of the government at the suppression hearing.

1. Lieutenant Michael Suhey: Suhey, a lieutenant with the Elmira Police Department ("the EPD") testified that at around 4:20 in the afternoon of February 3, 2017, he received a call routed through a county-wide dispatch center from a concerned citizen who reported drug activity and a suspicious vehicle. Feb. 16, 2018 Hr'g Tr., Docket # 21 ("Tr. 1"), at 9-10, 22. The caller "sounded

---

[1] Although some of the officers' testimony overlaps, I have separated their respective versions of the events because they each had slightly different perspectives and encounters with the defendant that, in turn, require separate discussion.

like an older woman" and "seemed to be familiar with [Suhey]," but Suhey did not hear the caller give her name  Tr. 1 at 1-12.  Suhey testified that he is hard of hearing and the office was very loud and busy at the time but the caller's voice was "familiar" to him. Tr. 1 at 12-14.  The caller indicated that three black males, using a blue or black Chevy Impala with New Jersey license plates[2] parked at a residence on West Third Street, were involved in drug activity.  Tr. 1 at 10-11, 37.  She did not provide specific information about the alleged drug activity, but was able to provide a New Jersey license plate number.  Tr. 1 at 38.  Suhey relayed the tip, which he believed at the time had been anonymous, to Raymond within a minute of hanging up with the caller. Tr. 1 at 11, 38.  Suhey does not remember exactly what he told Raymond, but he knows he relayed the description of the car and that "there's some black guys in it and they're involved with drugs on West Third Street."  Tr. 1 at 39.  At around 4:30 p.m., several minutes after Suhey's call with Raymond, Marsh announced on the radio that he had spotted the moving vehicle on West Third Street.  Tr. 1 at 40-42.

Later, upon reviewing a recording of the telephone call, Suhey learned that, although he had not heard it, the caller had in fact

---

[2] After listening to the recording, Suhey testified that the woman had not in fact said the license plates were from New Jersey.  Rather, the caller relayed a license plate number that was not in the typical New York format, alerting Suhey that the license plate was likely from out of state. Tr. 1 at 36.

identified herself to him as Carol Martin ("Martin"). Tr. 1 at 12-13; Hr'g Ex. 1. Suhey testified that Martin is a long-time Elmira resident who was well-known to the police for her numerous "contacts" with law enforcement. Tr. 1 at 13-14, 23. Suhey testified that Martin lives in a high crime area and that many of her calls to the police involved reports of drug activity. Tr. 1 at 25. He was aware that Martin had a criminal history, but did not, at the time, search the police blotter database available to him. Tr. 1 at 29-30. Had he done so, he would have found that Martin had been arrested 17 times and convicted of 12 offenses, one of which was bribery of a witness and others which involved fraud. Tr. 1 at 33-34; Hr'g Ex. A.

   2. Officer Robert Raymond: Lieutenant Suhey informed Officer Robert Raymond that a black Impala parked on West Third Street was engaged in narcotics activity. Tr. 1 at 50. Raymond further relayed this information to his partner, Officer Thomas Marsh. Raymond, who was travelling north on Davis Street in a marked police vehicle, observed the Impala as it crossed Davis Street traveling eastbound on West Third Street. Tr. 1 at 51. Raymond turned onto a street that ran parallel to West Third Street in an attempt to maintain a visual of the vehicle and intercept it. Tr. 1 at 54-55. The Impala turned left onto College Avenue. Tr. 1 at 55. According to Raymond, Zelko then turned left onto College

Avenue as well and was situated "between" the vehicle and Raymond.[3] Tr. 1 at 86.  Raymond, who could see the Impala turn from West Third Street, turned left onto College Avenue.  Tr. 1 at 55, 85-86.  As Raymond was travelling on College Avenue, he observed the vehicle come to a stop at the intersection with West Clinton Street a block or a block and a half ahead of him and then activate its right-hand turn signal.[4]  Tr. 1 at 58, 87.  Raymond was not sure how close Zelko was to the vehicle at this point.  Tr. 1 at 58, 87.  Raymond knew that the failure of the driver of the Impala to activate a turn signal greater than 100 feet before the intersection was a violation of New York State's Vehicle and Traffic Law.  Tr. 1 at 57-60.  Raymond continued to follow the Impala on West Clinton to the intersection of Park Place, where, again, he observed the driver of the Impala initiate a turn signal only after stopping at the traffic light.  Tr. 1 at 58.  Raymond radioed that he had observed a traffic violation to the other officers.  Tr. 1 at 90.

The vehicle turned left onto Park Place.  Raymond and Zelko activated their emergency lights for the signal violation, intending on stopping the vehicle for the observed traffic

---

[3] Raymond's testimony seems to indicate that Zelko was directly behind the vehicle when Raymond observed the traffic violation.  Zelko, however, testified that he turned onto College Avenue at same time that the vehicle was turning from College Avenue onto West Clinton Street.  Tr. 2 at 191.  Therefore, Zelko never saw the traffic violation Raymond alleges.

[4] On direct examination, Raymond indicated that the car was one block away.  On cross examination, he said that the car was a block and a half away.

violations.   Tr. 1 at 59, 90.   At the time Raymond activated his emergency lights, Zelko was directly behind the vehicle, and Raymond was directly behind Zelko.   Tr. 1 at 59, 90.   By the time the vehicle had stopped, Officer Marsh had also arrived and, together with Raymond and Zelko, they all approached the Impala. Tr. 1 at 60.

Raymond testified that as he approached the driver's side window he noticed a small knotted baggie resembling narcotics packaging in the back of the car.   Tr. 1 at 63-66; Hr'g Ex. 3.   He also observed three males in the vehicle: a driver, a passenger in the front seat, and a passenger in the back seat.   Tr. 1 at 61. The driver produced a driver's license bearing the name Barry Whitaker.   Tr. 1 at 61.   Raymond stood by the driver's door as Zelko identified the other passengers: Claude Charles and Jaquan Whitaker, the defendant's son.   Tr. 1 at 62-63.   Raymond testified that he detected the smell of raw marijuana coming from the Impala as he tried to speak to the defendant through the open driver's side window.   Tr. 1 at 67-68.

As he stood near the driver's side door, Raymond observed that Whitaker was yelling at a woman over the telephone through the speakers of the car.   Tr. 1 at 67.   According to Raymond, Whitaker was narrating the events to the woman and he was becoming increasingly agitated, leading Raymond to ask Whitaker to step out of the car.   Tr. 1 at 69.   The defendant did not comply; instead,

he began repeatedly yelling to the woman on the phone "call my lawyer." Tr. 1 at 69.

Meanwhile, based on the marijuana smell and the suspicious baggie, the officers decided to conduct a search of the vehicle. Tr. 1 at 72. The officers asked the two passengers to exit the vehicle and they complied. Tr. 1 at 70. Raymond again ordered the defendant out of the Impala. Tr. 1 at 70. At the time, the defendant's hands were raised because he was trying to light a cigar. Raymond opened the driver's side door and "grabbed [Whitaker's] left hand and started to stand him up out of the car." Tr. 1 at 70, 97. Whitaker tossed the cigar into the road and Raymond ordered him to place his hands behind his back. Tr. 1 at 70, 97. Raymond testified that Whitaker's right hand lingered suspiciously around his waistband. According to Raymond, Marsh took Whitaker's right hand and Marsh and Raymond "started to place [Whitaker's hands] behind his back." Tr. 1 at 71. The defendant was "yelling still" and was "increasingly more nervous and worked up." Tr. 1 at 71. According to Raymond, "as [the defendant] was reaching around," he asked the defendant, "do you have anything on you?," to which the defendant responded, "you're about to find it." Tr. 1 at 71. Raymond testified on cross-examination that he asked Whitaker if he had anything illegal on him as Whitaker was being handcuffed. Tr. 1 at 98-99. Marsh performed a pat down,

retrieved a handgun out of Whitaker's waistband, and secured the defendant in handcuffs.  Tr. 1 at 71.

Prior to placing Whitaker in the back of his patrol car, Raymond performed a "brief search" of Whitaker.  Inside Whitaker's left jacket pocket, Raymond discovered three bags of marijuana and a rolled $10 bill containing marijuana.  Tr. 1 at 73-74.  Having secured Whitaker in the patrol car, the officers performed a search of the Chevy Impala and found a backpack containing a large amount of heroin and packaging material in the trunk and fresh marijuana in the baggie visible in the back of the car.  Tr. 1 at 74-75.  Later, a bag of crack cocaine and heroin were found on Whitaker. Tr. 1 at 75-76.

3. Officer Thomas Marsh:  Officer Marsh testified that Raymond informed him of a black Chevrolet sedan with New Jersey license plates parked on West Third Street west of Davis Street, which was suspected of being engaged in narcotics activity.  Mar. 9, 2018 Hr'g Tr. ("Tr. 2") at 113-14.  At the time of the call, Marsh was traveling west on West Third Street, heading towards the parked car.  Tr. 2 at 114.  He continued down West Third Street for approximately two blocks and then observed the parked car that matched the description Raymond had provided.  Tr. 2 at 116-17. Marsh set up surveillance and within two or three minutes he observed several individuals enter the vehicle and then drive away. Tr. 2 at 119.  He relayed this information to Zelko and began to

follow the vehicle, maintaining a visual as the Impala accelerated down West Third Street until it made a left-hand turn on College Ave. Tr. 2 at 121. Raymond and Zelko followed behind the vehicle on College Avenue, and Marsh followed behind the officers. Tr. 2 at 121-22. Raymond and Zelko initiated a stop of the vehicle and Marsh arrived on the scene just as the Impala had stopped. Tr. 2 at 123-24.

Marsh testified that as he approached the passenger-side window of the vehicle with Zelko, he observed three male occupants. Tr. 2 at 124. He, like Raymond, observed a knotted white plastic baggie that resembled drug packaging in the center console. Tr. 2 at 125; see Hr'g Ex. 3, 5. At the same time, Marsh detected the odor of fresh marijuana. Tr. 2 at 126-27. Marsh identified the front seat passenger as Claude Charles and, based on the odor of marijuana and suspected narcotic packaging in plain view, removed him from the vehicle and placed him in a patrol car. Tr. 2 at 127-28. Marsh and Zelko then removed the rear passenger, Jaquan Whitaker, and learned that he was the son of the defendant. Tr. 2 at 129.

Having secured both passengers in patrol cars, Marsh and Raymond opened the driver-side door and Raymond asked the defendant to step out of the vehicle. Tr. 2 at 130. Whitaker refused to comply several times while speaking loudly to a female through a telephone connected to the car's Bluetooth audio system. Tr. 2 at

131. He was yelling that "he was getting arrested and that he was going to jail and to call his attorney." Tr. 2 at 132. Meanwhile, Whitaker began reaching for various objects inside the car including his cell phone and a pack of cigars, one of which he attempted to light. Tr. 2 at 133. After Whitaker threw the cigar into the street, Raymond grabbed the defendant's left arm and "assisted him into getting out of this vehicle." Tr. 2 at 133. At this time, Marsh was standing on the defendant's right-side and observed him reach for his waistband with this right hand. Tr. 2 at 133-34. Based on his training and experience Marsh was concerned that Whitaker may be reaching for a weapon concealed in his waistband, so he grabbed Whitaker's right hand and "immediately gained control over that right arm by grabbing his wrist." Tr. 2 at 133-34. At this point, Marsh was holding the defendant's right arm and Raymond was "controlling his left hand." Tr. 2 at 135. As Officer Marsh began a pat down of the defendant, Raymond asked the defendant if he "had anything on him." Tr. 2 at 135. Whitaker responded, "I do and he's about to find it." Tr. 2 at 135. The defendant made this statement about a "fraction of a second" before Marsh found and removed a gun in Whitaker's waistband. Tr. 2 at 135-36.

After seizing the handgun, the officers placed Whitaker in handcuffs and secured him in a patrol car. Tr. 2 at 138. Based on the odor of marijuana and the suspected narcotic baggie in plain

view, the officers began to search the Impala. Tr. 2 at 138.
Inside the plastic baggie, the officers found a green leafy
substance that resembled marijuana. Tr. 2 at 139. Even after
removing the baggie, the officers still detected the smell of
marijuana and decided to search the trunk. Tr. 2 at 139-40.
Located in the trunk was an orange and gray backpack and inside
the backpack was a box. Upon searching the backpack, Officer
Zelko discovered that the box contained narcotic packaging,
several bags, and baggies containing a powdery substance. Tr. 2
at 141; Hr'g Ex. 7.

After completing the search, Officer Marsh returned to his
car where Whitaker was seated in the back seat. Tr. 2 at 145.
Before transporting Whitaker to the EPD offices, Marsh advised the
defendant of his Miranda rights by reading them verbatim from a
standard police-issued card to Whitaker who was seated directly
behind Marsh. Tr. 2 at 145-47; Hr'g Ex. 4. Whitaker did not
appear to be under the influence of drugs or alcohol. Tr. 2 at
148. Marsh asked Whitaker if he understood the warnings and
Whitaker responded "Yes." Tr. 2 at 149. Whitaker never asked for
an attorney and never stated that he would not answer questions.
Tr. 2 at 154. Marsh did not ask the defendant any questions at
that time. Tr. 2 at 149. He proceeded to the EPD headquarters,
where Whitaker was processed. As part of that processing, Marsh
and Zelko searched the defendant again and found a clear plastic

11

baggie that contained a substance resembling heroin and cocaine as well as a large quantity of cash inside the defendant's jacket pocket.  Tr. 2 at 150-51.  While escorting Whitaker to a holding cell, Marsh asked Whitaker whether the items found the vehicle belonged to him.  Tr. 2 at 152.  The defendant indicated that the items were his and that he did not want his son to get into trouble. Tr. 2 at 152-53.

    4. Officer Christopher Zelko:  Officer Zelko testified that he was contacted via telephone by Marsh who communicated that a dark Chevrolet vehicle with New Jersey plates near West Third Street was possibly engaged in narcotics activity.  Tr. 2 at 186. As Zelko was making his way to the area on Columbia Street, he observed the car in question traveling eastbound at a "high rate of speed" on West Third Street as it passed the intersection with Columbia Street.  Tr. 2 at 187-89.  Zelko estimated that the car was traveling 40 to 45 miles per hour in a 30-mile-per hour zone. Tr. 2 at 187-89.  Zelko activated his emergency lights.  Tr. 2 at 197-98.  At West Third Street, Zelko turned right and observed the vehicle until it turned left onto College Avenue, at which point he lost sight of the vehicle.  Tr. 2 at 190.  Once Zelko reached College Avenue, he observed the car making a left from College Avenue onto West Clinton Street.  Tr. 2 at 191.  Zelko turned left onto College Avenue just as the vehicle was turning right off College Avenue onto West Clinton Street.  Tr. 2 at 191-92.  At

this point, Zelko passed in front of Raymond, who was traveling northbound toward Zelko on College Avenue but Zelko was unsure how close Raymond was to him.  Tr. 2 at 192.  Zelko did not issue Whitaker a traffic ticket for speeding.  Tr. 2 at 194-95.

5. Karen Francati:[5]  Karen Francati, an investigator employed by the Federal Public Defender's Office testified she visited the intersection of West Clinton Street and College Avenue and performed a reenactment of the position of the officers and the defendant during the time leading up to Whitaker's arrest.  Tr. 2 at 201.  First, she parked a car 100 feet from the intersection of West Clinton Street and College Avenue.  Tr. 2 at 204.  Then she parked a car in front of that car.  These cars were intended to mimic the location of the vehicle driven by the defendant and the police car behind it, driven by Officer Zelko.  Tr. 2 at 204.  Ms. Francati testified that from a block or so back, where Raymond was allegedly located, it would be very difficult to see the defendant's turn signal.  Tr. 2 at 201-05; Hr'g Exs. Q & R. According to Francati, from that vantage point, she could not see the signal on the parked car, suggesting that it would have been very difficult for Officer Raymond to accurately determine whether Whitaker had in fact signaled 100 feet prior to reaching the intersection.  Tr. 2 at 203-04.

---

[5] Ms. Francati's name was misspelled in the transcript as "Francoti."

## Discussion

Whitaker argues that his motion to suppress must be granted because the police did not have probable cause to initiate the traffic stop, either by virtue of Martin's call or as a result of the alleged traffic infraction.  Even assuming the stop was proper, Whitaker maintains that statements he made to police officers before he was Mirandized were the result of a custodial interrogation and that other statements were given without him waiving his Miranda rights.  There are several layers to Whitaker's legal arguments, but ultimately I recommend that the defendant's suppression motions be denied for the reasons that follow.

The Stop of the Impala:  The defendant argues that the traffic stop was not justified by the tip received by Lieutenant Suhey because he believed at the time that the tip that three individuals in a blue or black Chevy parked at residence on West Third Street were involved in drug activity was provided to police by an anonymous source.  Tr. 1 at 10-11, 37.  Whitaker contends that the information provided by the anonymous caller was insufficient to justify the stop of his vehicle.  I agree.

In Navarette v. California, 572 U.S. 393 (2014), the Supreme Court reiterated the standard under which investigative traffic stops are measured:

> The Fourth Amendment permits brief investigative stops—
> such as the traffic stop in this case—when a law
> enforcement officer has "a particularized and objective

14

basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-418 (1981); see also Terry v. Ohio, 392 U.S. 1, 21-22 (1968). The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability." Alabama v. White, 496 U.S. 325, 330 (1990). The standard takes into account "the totality of the circumstances—the whole picture." Cortez, supra, at 417. Although a mere "'hunch'" does not create reasonable suspicion, Terry, supra, at 27, the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause, United States v. Sokolow, 490 U.S. 1, 7 (1989).

Navarette v. California, 572 U.S. 393, 396-97 (2014) (internal parallel cites omitted).

Navarette is particularly relevant here because it addressed the special concerns present when an investigative stop is "based on information from anonymous tips." Id.

Of course, "an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity." White, 496 U.S. at 329 (emphasis added). That is because "ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations," and an anonymous tipster's veracity is "'by hypothesis largely unknown, and unknowable.'" Ibid. But under appropriate circumstances, an anonymous tip can demonstrate "sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." Id. at 327.

Navarette, 572 U.S. at 397; see United States v. Freeman, 735 F.3d 92, 97 (2d Cir. 2013) ("Anonymous tips, without further corroboration by the police to demonstrate that the tip has

sufficient indicia of reliability, are insufficient to provide the reasonable suspicion necessary for a valid Terry stop.").

Courts, including the Supreme Court, have often struggled with the legality of investigative stops based, in whole or in large part, on anonymous tips. In Alabama v. White, the tipster told police that a woman driving from a particular residence to a particular hotel in a brown Plymouth station wagon with a broken tail light was transporting cocaine. 496 U.S. at 327. Police stopped the car and found cocaine in the vehicle. Although describing it as a "close case," the Supreme Court found the stop of the vehicle was based on reasonable suspicion of criminal activity. The Court held that the ability of the tipster to predict future behavior "demonstrated inside information" and, as a result, it was "reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities." Id. at 332 ("When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.").

In Florida v. J.L., the police received a bare-bones anonymous tip "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268. When police arrived at the bus stop shortly thereafter, they observed

a young black male in a plaid shirt. The police stopped him, frisked him, and found a gun in his pocket. Id. However, because the tipster did not predict future behavior, did not explain how he knew about the weapon or how he knew the suspect, the information did not rise to the level of reasonable suspicion. Id. at 271 ("All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.").

Most recently, in Navarette, a divided Supreme Court again struggled with the sufficiency of an anonymous tip. At issue in Navarette was an anonymous 911 call accusing an individual driving a Silver Ford 150 pickup with plate number 8-D-94925 of running the "reporting party off the roadway" at a specific location. 572 U.S. at 395. Police responded to the area and spotted the truck. After following the vehicle for about five minutes, the police pulled the truck over. As the responding officers approached the truck, they smelled marijuana. The truck was searched and thirty pounds of marijuana were seized from the truck bed. The Court found that although it was a "close case," id. at 404, the 911 tipster was sufficiently reliable to credit the allegation that the driver of the truck tried to run the caller off the highway and this justified an investigative stop. Id. at 398-99. The Court found that the fact that (1) the caller "necessarily claimed

eyewitness knowledge" of the dangerous driving, (2) must have known that the truck was near the location where it was stopped, and (3) used the 911 system to report the incident and, in doing so, was presumably aware that 911 calls are recorded and traceable, all made the tip more reliable than the "bare-bones" tip found insufficient in J.L.   Id.

Applying these principles to the facts presented here, I find that the stop of the Impala cannot be justified on the basis of the anonymous tip.  As an initial matter, I conclude that the call was truly anonymous for purposes of evaluating cause to stop in light of the fact that Martin identified herself but Suhey did not hear the identification and therefore believed the call to be anonymous.  The government concedes that Suhey "misconstrued [the call] as anonymous" (Docket # 31, at 15) and therefore, Suhey had "no basis for judging [the informant's] credibility."  Marinis v. Vill. of Irvington, 212 F. Supp. 2d 220, 224 (S.D.N.Y. 2002); see United States v. Hayes, 574 F. Supp. 2d 308, 312 (W.D.N.Y. 2008) (finding that as the tipster did not provide the cell phone number before the stop occurred, the phone number could not have played any role in the officer's assessment of the caller's reliability). Thus, standing alone, the tip was insufficient to provide reasonable suspicion to justify the stop.  See United States v. Colon, 250 F.3d 130, 138 (2d Cir. 2001) (where the dispatcher and arresting officers acted on what they knew to be an anonymous tip,

it was clearly insufficient to provide a basis for reasonable suspicion to support the subsequent stop).[6]

However, under the totality of the circumstances, an anonymous tip may still establish cause to stop if bolstered by sufficient indicia of reliability. United States v. Simmons, 560 F.3d 98, 103 (2d Cir. 2009) (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). This Circuit views the relationship between reliability of the informant and corroboration by the police as a sliding scale. United States v. Elmore, 482 F.3d 172, 181 (2d Cir. 2007).

> Where the informant is completely anonymous . . . a significant amount of corroboration will be required. However, when the informant is only partially known (i.e., her identity and reliability are not verified, but neither is she completely anonymous), a lesser degree of corroboration may be sufficient to establish reasonable suspicion.

Id. As discussed above, the tip at issue here was, at the time it was received, perceived as completely anonymous. Corroboration of an anonymous tip requires law enforcement to verify the alleged

---

[6] Nor is there sufficient evidence for the Court to be able to impute Martin's identity to officers on the basis of the collective knowledge doctrine. Under the collective knowledge doctrine, a search or arrest is permissible where the actual arresting or searching officers lack specific information to form a basis for reasonable suspicion, as long as other law enforcement officers involved in the investigation know sufficient information that can justify a search or arrest. See United States v. Hensley, 469 U.S. 221, 230-33 (1985); United States v. Canieso, 470 F.2d 1224, 1230 n.7 (2d Cir. 1972). There is no evidence to suggest that any officer knew the caller's identity. Nor is there any indication that Martin ever identified herself to any other law enforcement or dispatching official aside from Suhey, who did not hear it. See Colon, 250 F.3d at 130 (information provided to civilian 911 operator lacking law enforcement training would not be imputed to arresting officers under collective knowledge doctrine to form basis to perform stop).

illegality, not just benign, non-criminal behavior or facts.[7] United States v. Person, 134 F. Supp. 2d 517, 525 (E.D.N.Y. 2001).

Here, the information the tipster provided to law enforcement fell much closer to what was found by the Supreme Court to be insufficient in J.L. than what was determined to be sufficient in White. The caller did not provide any predictive fact that would show that she had some inside information about the defendant or his alleged criminal behavior. Rather, the anonymous caller here is similar to the bare-bones tip in J.L. Martin stated only the make, color, and license plate number of a vehicle, and made an unsupported assertion that three black individuals in that car were involved in drug activity. While the police were able to corroborate the existence of the vehicle described by the caller, as in J.L., they were unable to verify any predictive information or illegal behavior prior to initiating the stop. Verification of bare facts "containing only a location, identifying information, and an allegation" are not sufficient to adequately establish cause

---

[7] The Second Circuit has also found probable cause for a stop when an anonymous informant presents information regarding an ongoing, dangerous criminal act. For example, in Simmons, the court held that the officers' corroboration of information identifying the suspect is entitled to more weight in the context of an emergency 911 call regarding an ongoing assault involving a firearm. 560 F.3d at 105. And in United States v. Bold, the Second Circuit held that law enforcement's corroboration of a particular car parking in a particular location was enough where the anonymous informant claimed that three men in the car possessed firearms and ammunition. 19 F.3d 99, 102 (2d Cir. 1994). The Second Circuit has reasoned that tips related to drug deals have a "significant and important" distinction from tips related to firearms. Id. at 104. As the latter could lead to fatal consequences, less corroboration is required. Id. No such facts exist here.

to stop. <u>United States v. Herron</u>, 18 F. Supp. 3d 214, 226 (2d Cir. 2014) ("Because bare identifying information is not enough to establish even reasonable suspicion . . . the officers would need to adequately corroborate the tip to establish probable cause."). Accordingly, the caller's anonymous, non-predicative tip was insufficient to establish probable cause or reasonable suspicion for the stop of the Impala Whitaker was driving.

Observance of the Traffic Violation: Alternatively, the government argues that if the anonymous call did not provide legal justification to stop the defendant's vehicle, Whitaker's failure to activate his directional signal less than 100 feet before turning at an intersection did.[8]  The government contends that Officer Raymond observed the defendant commit a violation of section 1163 of the New York Vehicle and Traffic Law, which requires that drivers signal their turn at least 100 feet before the intersection.  For his part, the defendant maintains that the fruit of the traffic stop must be suppressed because it would have been impossible for Raymond to see Whitaker's vehicle commit a violation from his vantage point.  Def.'s Opp. Mem. (Docket # 32), at 2.

An automobile stop constitutes a "seizure" for Fourth Amendment purposes.  <u>Whren v. United States</u>, 517 U.S. 806, 810

---

[8] I do not, however, credit Zelko's conclusion that, in a fleeting moment through an intersection ahead of him, he was able to discern that the defendant was speeding.

(1996) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979));
United States v. Gomez, 877 F.3d 76, 86 (2d Cir. 2017). The
defendant has satisfied his burden to establish that he was seized
when Raymond and Marsh activated their emergency lights and pulled
over the defendant. See United States v. Murphy, 778 F. Supp. 2d
237, 255 (N.D.N.Y. 2011), aff'd, 703 F.3d 182 (2d Cir. 2012)
(defendant seized when traffic stop initiated). The burden now
rests with the government to demonstrate by a preponderance of the
evidence that the seizure did not violate the defendant's Fourth
Amendment rights. United States v. Arboleda, 633 F.2d 985, 989
(2d Cir. 1980).

An automobile stop must be reasonable under the circumstances
to satisfy the Fourth Amendment. Whren, 517 U.S. at 810. For an
automobile stop to be reasonable, the officer making the stop must
"have probable cause or reasonable suspicion that the person
stopped has committed a traffic violation or is otherwise engaged
in or about to be engaged in criminal activity." Holeman v. City
of New London, 425 F.3d 184, 189 (2d Cir. 2005); see Terry, 392
U.S. at 21. "Any evidence seized based upon an illegal stop is
'subject to the fruit of the poisonous tree doctrine,' and may be
suppressed." United States v. Scopo, 19 F.3d 777, 781 (2d Cir.
1994) (quoting United States v. Hassan El, 5 F.3d 726, 729 (4th
Cir. 1993)). "It is within the province of the district court as

the trier of fact to decide whose testimony should be credited."
Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012).

After presiding over suppression hearings involving traffic stops for over two decades, I note a driver's failure to signal at least 100 feet before turning seems to be the "justification du jour" for recent stops based on observed traffic infractions.  That being said, the Supreme Court has instructed that a traffic stop, even if pretextual, does not violate the Fourth Amendment, so long as it is based on an observed violation of the vehicle and traffic law.[9]  Whren, 517 U.S. at 811-12.  "In other words, an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance."  United States v. Dhinsa, 171 F.3d 721, 724-25 (2d Cir. 1998).  "On the other hand, if it is clear that what the police observed did not constitute a violation of the cited traffic law, there is no 'objective basis' for the stop, and the stop is illegal."  United States v. Escalante, 239 F.3d 678, 680-81 (5th Cir. 2001).

Recognizing that Raymond's motivation for stopping the Impala had absolutely nothing to do with enforcing New York's vehicle and traffic laws, I nevertheless find his testimony (Tr. 1 at 87) that

---

[9] At least one Justice, however, seems inclined to reevaluate the Supreme Court's treatment of pretextual stops.  District of Columbia v. Wesby, 138 S. Ct. 577, 594 (2018) (Ginsburg, J., dissenting) ("I would leave open, for reexamination in a future case, whether a police officer's reason for acting, in at least some circumstances, should factor into the Fourth Amendment inquiry.").

he observed the defendant's car commit a traffic violation by failing to use his directional at least 100 feet before turning credible. Raymond has been an EPD officer for five years, two of which he spent on afternoon patrol duty. Tr. 1 at 48. His testimony was unequivocal, explicit and made under penalty of perjury. Under Supreme Court precedent, it is sufficient to justify the stop of the Impala for a violation of section 1163 of the New York Vehicle and Traffic Law regardless of Officer Raymond's true objective in making the stop.

Whitaker's efforts to discredit Raymond's testimony were not persuasive. Whitaker suggests that Raymond's testimony contained inconsistencies. For example, according to the defendant, Raymond testified on direct examination that he was one block away from the defendant's car at the time he observed the traffic violation (Tr. 1 at 58), and he testified on cross-examination that he was one-and-a-half blocks away (Tr. 1 at 87). I do not find this apparent inconsistency significant enough to render Raymond's testimony suspect. As he indicated, Raymond was "approximately" one block away from the intersection at the time of the alleged traffic violation. Tr. 1 at 58. Viewing all of the photographs from the scene introduced at the hearing, I do not find the difference of a half a block to be a material inconsistency.

Similarly, Raymond testified that Zelko was "between" the defendant's car and Raymond at the time the defendant turned right

24

(Tr. 1 at 86), and Zelko testified that he was not directly behind the defendant, but rather turning onto the defendant's street at the time of the alleged traffic violation (Tr. 2 at 191-92). I am not convinced that this is an inconsistency at all. Raymond's testimony that he was "between" Zelko and the defendant is consistent with Zelko's testimony that he was turning onto College Avenue from the street in between Raymond and the defendant. Raymond never testified that Zelko was directly behind the defendant's car, obscuring his vantage point.

Ms. Francati's testimony does not change my view on Officer Raymond's veracity. Although Raymond initially testified that Zelko was behind the defendant at the time the defendant turned, Zelko explained that he was actually turning onto the street the defendant was turning off of. This explains why Zelko did not see the violation and why Raymond could: Raymond had an unobstructed view of the car. Francati's reenactment was premised on the flawed assumption that Zelko was directly behind the defendant at the time the defendant turned, thereby blocking Raymond's view. Without Zelko directly behind the defendant's car, there is no reason to doubt that Raymond could have seen the defendant's taillights. Even if Zelko was directly behind the defendant's car, the reenactment does not demonstrate that it was impossible for Raymond to see the defendant's taillights from his vantage point.

Finally, that Raymond was a block or a block and a half away from the defendant's car at the time of the violation does not render his testimony unworthy of belief. I can clearly see the vehicle at the stop sign in the exhibits intended to demonstrate the reenactment of the defendant's vehicle. It would be possible to discern if the car was stopped at the stop sign and, as Raymond testified, activated the turn signal while at the intersection. Notably, Francati's reenactment did not include activated turn signals, which would have illuminated the car's lights and presumably made it easier to see the Impala from a distance. In addition, Francati positioned a car 100 feet in front of the stop sign. There is no evidence that any vehicle was located 100 feet from the stop sign. Rather, Raymond testified that the defendant's vehicle was stopped at the stop sign; the traffic violation occurred because the defendant did not signal at least 100 feet before the intersection.

Suppression of Whitaker's Post-Arrest Statements: Assuming that his statements are not suppressed as the "fruit" of an illegal stop, Whitaker also argues that his Miranda rights were violated. Specifically, Whitaker claims that law enforcement violated his Fifth Amendment rights when Raymond asked Whitaker "do you have anything on you?" (Tr. 1 at 71) prior to advising Whitaker of his Miranda rights. He also contends that statements he made later at

the EPD station should be suppressed because he had not waived his
Miranda rights.  I disagree with both of the defendant's arguments.

    Ordinarily, statements made by a suspect during a custodial
interrogation[10] will be suppressed if they are not preceded by
Miranda warnings.  See United States v. Estrada, 430 F.3d 606, 610
(2d Cir. 2005).  However, the Supreme Court has identified a
"narrow exception to the Miranda rule" where officers ask a
defendant "questions necessary to secure their own safety or the
safety of the public."  New York v. Quarles, 467 U.S. 649, 658-59
(1984).  The exception "does not depend upon the subjective
motivation of the questioning officer."  United States v. Newton,
369 F.3d 659, 677 (2d Cir. 2004).  Rather, the Second Circuit has
held that "Miranda warnings need not precede 'questions reasonably
prompted by a concern for the public safety' or for the safety of
the arresting officers."  United States v. Reyes, 353 F.3d 148,
152 (2d Cir. 2003) (quoting Quarles, 468 U.S. at 658-59).  This
public safety exception applies so long as the questioning
"relate[s] to an objectively reasonable need to protect the police
or the public from any immediate danger."  Quarles, 467 U.S. at
659 n.8. In other words, the "public safety" exception "permits
the admission of answers to questions posed in a limited custodial
interrogation in the absence of Miranda warnings so long as the

_____

[10] The government does not appear to object to classifying either statement as
the result of a custodial interrogation. Gov't's Br. (Docket # 31) at 37 ("While
in custody at this point, law enforcement question [sic] was permitted as part
of the 'public safety' exception to the Miranda requirement . . . .").

questions" are prompted by a concern for public safety.  United States v. Garcia, 279 F. Supp. 2d 294, 301 (S.D.N.Y. 2003).

The Second Circuit discussed the parameters of the public safety exception in United States v. Estrada, 430 F.3d 606 (2d Cir. 2005) and United States v. Ferguson, 702 F.3d 89 (2d Cir. 2012).  In those cases, the Second Circuit identified three factors that are persuasive to denying a motion to suppress on the basis of the public safety exception:

> First, the questioning without Miranda warnings related to an "*objectively* reasonable need to protect the police or the public from any immediate danger." [Estrada, 430 F.3d] at 612 (internal quotation marks omitted). Second, the objective facts did not suggest that the questioning was "a subterfuge," id. at 613, "designed solely to elicit testimonial evidence from a suspect," id. at 612, but instead that the questioning was generally targeted at a safety concern, id. at 613. Finally, the questions were not routinely put to arrested suspects, id. at 612, but rather were supported "by an objectively reasonable need to protect" against a perceived danger, id. at 613.

Ferguson, 702 F.3d 89, 94 (2d Cir. 2012).  Applying these standards in Estrada, the Second Circuit held that the public safety exception applied to statements made by a defendant who had been previously convicted of assault and was suspected of having a gun while the police were standing over him and attempting to arrest him.   430 F.3d at 608-14.   Similarly, in Ferguson, the Second Circuit found that even an interrogation lasting longer than 30 minutes while the suspect was handcuffed and in custody was subject to the public safety exception because the police had a reasonable

basis to believe that defendant had hidden a weapon in a public place.   702 F.3d at 94-95.

Based on the foregoing, I find that Officer Raymond's question to Whitaker, while not preceded by Miranda's prophylactic warnings, met the requirements of the public safety exception. His question, "do you have anything on you?" was prompted by an objectively reasonable concern for the safety of the arresting officers.[11] As the officers were taking the defendant into custody, he reached to his waistband, raising the officers' fear that Whitaker had a weapon.   It is significant that the testimony suggests that the question was asked while Raymond and Marsh were trying to restrain Whitaker, but before he was handcuffed.   Tr. 1 at 71; Tr. 2 at 133-36.   Although the precise moment of when the question was asked is not certain from the testimony, it is clear that the police officers had not yet completely secured Whitaker when the question was asked.   Tr. 1 at 71-72; Tr. 2 at 133-36. Indeed, the Second Circuit has found the public safety exception to apply even where the defendant was already handcuffed.   See Newton, 369 F.3d at 678 (finding public safety exception applied even where defendant was handcuffed because there was information that a gun was located in the apartment and there were several unsecured and potentially hostile individuals standing around);

---

[11] Although subjective fear for safety is not required, Marsh did testify that, based on his training and experience, he was concerned for his safety at the time.   Tr. 2 at 133-34.

see also Garcia, 279 F. Supp. 2d at 302 (finding public safety exception to apply even though question was asked while defendant was handcuffed because officers "were not yet in complete control of the situation"). Therefore, Raymond's question was prompted by a reasonable concern for the officers' safety given that Whitaker was not completely restrained and could have still posed a risk to the arresting officers.

Second, Raymond's question was not a "subterfuge" designed to elicit evidence from suspect. See Estrada, 430 F.3d at 613. Whitaker does not argue that Raymond's question "do you have anything on you?" was anything other than a questioned intended for public safety purposes. The Second Circuit has rejected claims that similar questions were impermissibly broad. For example, in Newton the Second Circuit found that a question inquiring about the presence of "contraband" was still subject to the public safety exception. In doing so, the court recognized that "public safety questions are framed spontaneously in dangerous situations. Precision crafting cannot be expected in such situations." Newton, 369 F.3d at 678; see Ferguson, 702 F.3d at 94 ("Furthermore, even if some of Sergeant Rule's questions had been broad enough to elicit other information, the public safety exception would still apply because the context in which the officers acted made clear that the questions primarily involved safety.") (internal quotation marks and alterations omitted).

Finally, although the hearing testimony does not indicate whether questions such as "do you have anything on you?" are routinely put to suspects, it is reasonable here to find that the events preceding Raymond's inquiry show that his question was prompted by a justifiable fear for officer safety. Prior to being pulled out of the car, Whitaker was loud and combative. He was screaming over the phone to another individual and attempted to light a cigar while being ordered out of the car. Tr. 1 at 70, 91. Because Raymond's question was prompted by an immediate public safety concern, Miranda warnings were not required and Whitaker's response need not be suppressed.

Whitaker next argues that an answer to a question Marsh asked at the police station after Whitaker received Miranda warnings but before he waived those rights must be suppressed. He does not argue that he never invoked his Miranda rights. Therefore, it appears his sole argument is that he never validly waived his rights prior to being asked the question by Marsh. I disagree because the evidence adduced at the hearing makes clear that Whitaker never invoked his right to remain silent and instead waived his Miranda rights by speaking to Marsh.

"The prosecution [] does not need to show that a waiver of Miranda rights was express. An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." Berghuis v. Thompkins, 560 U.S. 370, 384 (2010). All

31

that is required is that the <u>Miranda</u> warnings be given - which is not contested here - and that a defendant makes a voluntary, intelligent, and knowing waiver of those rights. <u>United States v. Jaswal</u>, 47 F.3d 539, 542 (2d Cir. 1995) ("To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."). "Where the prosecution shows that a <u>Miranda</u> warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." <u>Berghuis</u>, 560 U.S. at 384. This is so because "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." <u>Id.</u> at 385.

The hearing testimony here confirms that the defendant received and understood the warnings given to him. There is no dispute that Whitaker never invoked his <u>Miranda</u> rights which would have required the police to cease all questioning. Whitaker simply contends that he had never validly waived his <u>Miranda</u> rights. There is no evidence supporting this contention in the record. Rather, like in <u>Berghuis</u>, the testimony adduced at the hearing makes clear that Whitaker waived his <u>Miranda</u> rights by agreeing to

speak with law enforcement and answering Officer Marsh's questions.

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that the defendant's motion to suppress evidence and statements (Docket # 16) be **denied**.

_____
JONATHAN W. FELDMAN
UNITED STATES MAGISTRATE JUDGE

Dated:     Rochester, New York
           September 21, 2018

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated:    September 21, 2018
          Rochester, New York

---

[1] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th Cir. 1991), cert. denied, 502 U.S. 1103 (1992); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).